**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**JOSE RODRIGUEZ,**

                                                    **Plaintiff,**

          **vs.**                                                              **9:15-CV-0610**
                                                                                       **(MAD/TWD)**

**JEFFREY MCKOY, DR. MIKHAIL GUSMAN,**
**DR. ANN ANDOLA, DR. BIPIN BHAVSAR,**
**NANCY ANTHONY, MEGAN MCGLYNN,**
**AMANDA DEMSHICK, DAVID JACOBS, and**
**ROGER TRAYNOR,**

                                                    **Defendants.**
_____

**APPEARANCES:**                                          **OF COUNSEL:**

**PAUL, WEISS, RIFKIND,**                            **JANE B. O'BRIEN, ESQ.**
**WHARTON & GARRISON LLP**                    **ERIN J. MORGAN, ESQ.**
1285 Avenue of the Americas                          **KATHRYN BRENNAN, ESQ.**
New York, New York 10019-6064                    **MATTEO GODI, ESQ.**
Attorneys for Plaintiff

**OFFICE OF THE NEW YORK**                       **MATTHEW P. REED, AAG**
**STATE ATTORNEY GENERAL**                      **KONSTANDINOS D. LERIS, AAG**
The Capitol
Albany, New York 12224
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiff Jose Rodriguez commenced this action on May 19, 2015, pursuant to 42 U.S.C. §

1983, asserting claims arising out of an alleged failure to provide him with adequate medical

attention and treatment in the period leading up to a stroke he suffered while he was an inmate in

the custody of the New York State Department of Corrections and Community Supervision

("DOCCS").[1]  Plaintiff also alleges that, in retaliation for commencing this lawsuit, DOCCS transferred him to a correctional facility that was not easily accessible to his counsel and limited the number and length of his legal phone calls.  In his fifth amended complaint, Plaintiff asserts three causes of action: (1) infliction of cruel and unusual punishment in violation of his Eighth Amendment rights against Defendants Gusman, Andola, Bhavsar, and Anthony; (2) retaliatory transfer in violation of his First Amendment rights against Defendants McGlynn and Demshick; and (3) denial of access to the courts in violation of his First Amendment rights against Defendants McKoy, Jacobs, and Traynor.  *See* Dkt. No. 96.

Currently before the Court is Defendants' motion for summary judgment.  *See* Dkt. No. 136.

## II. BACKGROUND

Plaintiff was born on November 30, 1962.  *See* Dkt. No. 136-8 at 16.  In 2011, Plaintiff was in DOCCS custody at Eastern Correctional Facility ("Eastern").  Defendants Gusman, Andola, and Bhavsar were clinical physicians and Defendant Anthony was a registered nurse at Eastern (collectively, the "Medical Defendants").  In the time period leading up to his stroke in February 2012, Plaintiff regularly met with the Medical Defendants.  *See generally* Dkt. No. 137-3 at 13-70.  A summary of those meetings follows below.  On January 4, 2011, Defendant Gusman saw Plaintiff after he requested a rubber ball for hand exercises.  *See id.* at 34.  On February 1, 2011, Plaintiff attended sick call with a question concerning a rescheduled doctor's appointment.  *See id.* at 3, 33.  Plaintiff was seen by Defendant Anthony, who recorded Plaintiff's

---

[1]  Although Plaintiff filed this action *pro se*, he has been represented by counsel since March 2017.  *See* Dkt. Nos. 27, 134, 140, 141.  On September 6, 2017, Plaintiff was released from custody and deported to the Dominican Republic, where he remains to this day.  *See* Dkt. Nos. 102, 119.

blood pressure as 121/74. On February 3, 2011, Defendant Gusman saw Plaintiff related to occupational therapy Plaintiff was undergoing. *See id.* at 32.

On May 20, 2011, Plaintiff met with nursing staff at Eastern, complaining that he would occasionally have a racing heart rate, especially at night, where he could feel and hear his heart beating in his chest. *See id.* at 31. The medical records note that Plaintiff did not report any pain, headache, or dizziness, and recorded his blood pressure as 144/88. *See id.* The nurse requested a doctors appointment and, on May 25, 2011, Plaintiff was seen by Defendant Andola. *See id.* at 30. Defendant Andola recorded Plaintiff's complaints of a periodical racing heart beat and occasional heart palpitations, and recorded his blood pressure as 145/94, his heart rate at 73, and the percentage of oxygen in his blood as 98%. *See id.* Defendant Andola also noted that Plaintiff ran daily without exertional chest pain, was a non-smoker, had no added salt in his diet, and had denied any dizziness, tremor, anxiety or diarrhea. *See id.* Defendant Andola ordered an electrocardiogram ("EKG") and bloodwork, and issued Plaintiff a blood pressure card, which allowed him to have his blood pressure monitored by medical staff weekly to ensure it stayed within normal limits. *See id.*[2]

Defendant Andola reviewed Plaintiff's blood work on June 23, 2011, and indicated that "no action [was] required at [that] time." Dkt. No. 137-1 at 11. In her declaration, Defendant Andola stated that she had "observed no concerning abnormalities in [P]laintiff's labs." *Id.* at 4. Defendant Andola reviewed Plaintiff's EKG on July 13, 2011, and "observed that Plaintiff's EKG was normal, indicating normal sinus rhythm." *Id.* at 4, 15. Defendant Bhavsar also reviewed Plaintiff's EKG and came to the same conclusion. *See* Dkt. No. 137-2 at 2.

---

[2] Although Plaintiff appears to have had his blood pressure monitored in accordance with the blood pressure card, the results of that monitoring are not included in the record.

On July 28 and July 29, 2011, Defendant Gusman met with Plaintiff to review complaints of lower back pain and issues related to Plaintiff's exercise routine.  *See* Dkt. No. 137-3 at 28, 29. Defendant Gusman recorded a blood pressures of 130/80 and 140/82 and reviewed the bloodwork ordered by Defendant Andola, "observ[ing] no concerning abnormalities."  *Id.* at 5, 28. Defendant Gusman ordered an x-ray of Plaintiff's back.  Plaintiff was seen again on August 2, 2011, and his blood pressure was recorded as 138/85.  *See id.*  On August 9, 2011, Defendant Gusman reviewed the ordered x-ray, and "observed no concerning abnormalities."  *Id.* at 6-7. Finally, on October 13, 2011, Plaintiff met with a nurse to obtain an ice bucket to soak his sore ankles and feet from running in the yard.  *See id.* at 27.  Plaintiff's blood pressure was 149/86.

Plaintiff suffered a stroke while lifting weights at Eastern on February 16, 2012.  Plaintiff was transferred to Coxsackie Correctional Facility ("Coxsackie") to receive medical treatment. As a result of his stroke, Plaintiff was permanently paralyzed on his left side, leaving him confined to a wheelchair, and he suffers from slurred speech, blurred vision, dizziness, and chronic headaches.  After ten months at Coxsackie, Plaintiff was transferred to Shawangunk Correctional Facility ("Shawangunk"), a maximum-security facility.  On August 20, 2013, Plaintiff filed a grievance with the Inmate Grievance Resolution Committee ("IGRC"), alleging improper medical treatment at Eastern in connection with his stroke.  The IGRC concluded that Eastern's medical personnel demonstrated deliberate indifference to Plaintiff's serious medical condition.  This finding was sent to the Superintendent, who denied the grievance on September 30, 2013.  Plaintiff appealed his claim to the Central Office Review Committee which, in April 2014, upheld the Superintendent's decision.  Plaintiff then commenced the present action in May 2015, alleging that his Eighth Amendment rights had been violated when Eastern's medical personnel demonstrated deliberate indifference to his serious medical condition.  *See* Dkt. No. 1.

In April 2016, a review of Plaintiff's security classification was conducted by an automated computer system.  *See* Dkt. No. 136-5 at 4.  These reviews occur every six months and the computer generates a score based on a number of characteristics, including: an inmate's disciplinary history, their sentence length, the violence of the underlying offense, how long the inmate has been incarcerated, and the inmate's program history.  *See id.* at 3.  In this instance, the classification review generated a recommendation that Plaintiff's security classification be reduced from maximum to medium.

Defendant Demshick was the Offender Rehabilitation Coordinator at Shawangunk at this time.  It was her responsibility to review the automated system's classification recommendations and take the necessary steps to initiate a transfer to another facility where appropriate.  *See* Dkt. No. 136-3 at 3.  Defendant Demshick thereafter submitted a transfer request to DOCCS' Central Office, noting that the automated system had recommended reducing Plaintiff's security classification and that he had displayed adequate custodial adjustment and programming.  *See id.* at 9.

Defendant McGlynn, a Class and Movement Analyst at DOCCS' Central Office, was then assigned to the transfer request.  Defendant McGlynn testified that it was DOCCS policy "to house prisoners in the least restrictive appropriate facility."  Dkt. No. 136-5 at 4.  Defendant McGlynn contacted a health services analyst, seeking a list of medium security facilities that were able to meet Plaintiff's specific medical needs.  *See id.* at 9.  The health services analyst indicated that only three correctional facilities could accommodate Plaintiff's security and medical requirements: Franklin Correctional Facility ("Franklin"), Livingston Correctional Facility, and Orleans Correctional Facility.  *See id.* at 10.  Defendant McGlynn testified that even though she was "not obligated to choose [the facility] that is closest to [an inmate's] present facility, or take

5

any preference into consideration," and that "[a]n inmate has no right to be housed in a particular prison of their own choosing," she ultimately chose Franklin because "it appeared to be the closest to the [P]laintiff's desired region." *Id.* at 5.  Defendant McGlynn "made this estimation simply by looking at a map, and did not plan a route or calculate the mileage." *Id.*  Plaintiff was transferred to Franklin in July 2016.

Meanwhile, in May 2016 (two months before his transfer to Franklin), Plaintiff was approached by a Shawangunk correction officer while he was playing chess.  *See* Dkt. No. 136-8 at 72-73.  The correction officer handed Plaintiff a letter that he had received and stated, "[O]h, you're the one that wants money from the state." *Id.*  The correction officer did not make any further statements.

Shortly after Plaintiff arrived at Franklin, DOCCS began restricting Plaintiff's telephone calls with his counsel to one call for a maximum of thirty minutes every thirty days.  DOCCS stated that it was enforcing this restriction in accordance with DOCCS Directive 4423, which states in relevant part:

> IX. ATTORNEY LEGAL CALLS
>
> A. Generally, attorneys are expected to communicate with their inmate clients through privileged correspondence in accordance with Part 721 of Title 22 NYCRR or during legal visits (see Directive #4404, "Inmate Legal Visits").  There may, however, be certain circumstances where an attorney will need to communicate confidentially with his or her inmate client by telephone.
>
> B. In the absence of specific court order or written direction from the Department's Office of Counsel to the contrary, the following protocols shall apply to confidential attorney legal calls:
> * * *
> 5. The attorney must not have had a legal call with the inmate in the last 30 days;
> * * *
> 8. The call must not exceed 30 minutes in duration.
> * * *

> E. If the correctional facility denies an attorney's request for a legal call, the attorney can call or write to the Office of Counsel using Office of Counsel contact information provided by the correctional facility;

Dkt. No. 136-6 at 18-19.

Defendant McKoy is the Deputy Commissioner for Program Services at DOCCS Central Office. In his role as Deputy Commissioner, Defendant McKoy signed and enacted Directive 4423. *See id.* at 2. Defendant Jacobs was Plaintiff's Offender Rehabilitation Coordinator at Franklin during the relevant time period, and was responsible for scheduling his legal calls. In the twelve month period between Plaintiff's arrival at Franklin and his release, Plaintiff was allowed eleven calls. *See* Dkt. No. 136-4 at 20. DOCCS denied a number of requests by Plaintiff's counsel for additional calls.

In October 2016, Plaintiff began filing grievances requesting transfer to a correctional facility closer to his counsel and challenging the restrictions on his legal phone calls.[3] Defendant Traynor, a Supervising Offender Rehabilitation Coordinator at Franklin, was assigned to review Plaintiff's grievances. Defendant Traynor ultimately denied the grievances, reasoning that there was no improper practice or procedure involved because Plaintiff's phone calls were properly restricted under Directive 4423 and he was not entitled to be housed in a correctional facility of his choice. *See* Dkt. No. 136-7 at 21-22.

### III. DISCUSSION

**A.    Standard of Review**

---

[3] Plaintiff addressed one of these grievances to Defendant McKoy. Defendant McKoy did not personally investigate or respond to this letter; instead, it appears it was referred to Inmate Grievance. *See* Dkt. No. 136-6 at 2, 8.

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law.  *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried."  *Id.* at 36-37 (quotation and other citation omitted).  Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986).  In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  *See Chambers*, 43 F.3d at 36 (citing *Anderson*, 477 U.S. at 255) (other citations omitted).  Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute.  *See Anderson*, 477 U.S. at 258.

The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case.  *See id.* at 325.  Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial.  *See* Fed. R. Civ. P. 56(e).

**B.    Deliberate Indifference**

Defendants argue that Plaintiff "has failed to demonstrate that they intentionally denied or delayed his access to medical care, and therefore failed to preemptively prevent his stroke from occurring."  Dkt. No. 136-1 at 5.  Defendants assert that the record establishes they, in fact, "made repeated efforts to treat [P]laintiff's complaints" and that Plaintiff "received the standard of care

that any reasonable medical provider in [D]efendants' position would have provided," precluding a finding that they were deliberately indifferent to Plaintiff's serious medical needs. *Id.* at 8-9. In opposition, Plaintiff argues that "there are genuine and material factual disputes as to whether Defendants . . . failed to act while aware of 'a substantial risk' that [Plaintiff] would suffer 'serious' harm." Dkt. No. 142 at 11. Specifically, Plaintiff asserts that there is conflicting evidence in the record as to whether (1) his "elevated blood pressure levels were dangerously high" during the time leading up to his stroke, (2) the "level of medical care that [he] received departed from accepted professional standards," and (3) "defendants were able to communicate with [him] to treat him adequately" without providing a Spanish interpreter. *Id.* at 11, 13, 15 (internal capitalization omitted). The Court concludes that the record here demonstrates that Plaintiff's claim amounts to a difference in opinion as to the medical treatment Plaintiff required.

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. This prohibition encompasses the provision of medical care involving "the unnecessary and wanton infliction of pain." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (citations omitted). However, the United States Supreme Court has recognized that not "every injury" a prisoner suffers "translates into constitutional liability for prison officials." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). In order to establish an Eighth Amendment claim for medical indifference, a plaintiff must allege that the defendant was deliberately indifferent to a serious medical need. *See id.* This standard requires proof of both an objective and subjective element.

The objective component "requires that the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quoting *Hathaway v.*

*Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)) (internal quotation marks omitted).  For purposes of this motion, Defendants concede and the Court will accept, that Plaintiff's condition constituted a sufficiently serious medical condition to meet the objective prong of deliberate medical indifference.  *See* Dkt. No. 136-1 at 3.

Under the subjective component, medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act . . . that evinces 'a conscious disregard of a substantial risk of serious harm.'"  *Chance v. Armstrong*, 143 F. 3d 698, 703 (2d Cir. 1998) (quoting *Hathaway*, 99 F.3d at 553).  Thus, the defendant "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [the official] must also draw the inference."  *Framer*, 511 U.S. at 837. Satisfying this standard "entails something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."  *Id.* at 835.  Accordingly, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."  *Farmer*, 511 U.S. at 838; *see also Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976) (holding that an "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference"); *Chance*, 143 F.3d at 703 (holding that "[m]ere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate); *Hathaway*, 99 F.3d at 553 (holding that "mere medical malpractice" does not constitute deliberate indifference unless the malpractice involved "culpable recklessness").

Defendants have met their initial burden of establishing that there is no genuine issue of material fact to be decided.  The Medical Defendants' testimony and Plaintiff's medical records

establish that the Medical Defendants continuously monitored Plaintiff's blood pressure in the period leading up to his stroke and, after he complained of a periodical racing heart beat and occasional heart palpitations, that Defendant Andola ordered an EKG, bloodwork, and issued Plaintiff a blood pressure card.  Neither the EKG nor the bloodwork raised any concerning abnormalities and, despite meeting with the Medical Defendants five more times before his stroke, Plaintiff never again complained of a racing heart beat or heart palpitations.  *See* Dkt. No. 137-3 at 27-29.  Indeed, according to the Medical Defendants' testimony, Plaintiff did not present with any risk factors for a stroke other than his elevated blood pressure.  *See id.* at 9, 30.  With respect to Plaintiff's language barrier, Defendant Gusman testified that in-person interpretation was available when necessary and that, here, Plaintiff "conversed freely with [him] and other members of the staff in English."  *Id.* at 11.

    In opposition, Plaintiff does not offer the testimony or report of an independent medical expert to demonstrate that there is a genuine unresolved issue of material fact for trial.  Instead, Plaintiff relies on the deposition testimony of the Medical Defendants, which he argues contains conflicting testimony that cannot be resolved on summery judgment.  Initially, despite Plaintiff's characterizations to the contrary, the Medical Defendants consistently testified that Plaintiff's blood pressure was only mildly elevated or near the upper limit of normal blood pressure for someone of Plaintiff's age.  *See, e.g.,* Dkt. No. 142-4 at 45, 51-52; Dkt. No. 142-3 at 106-07.  Plaintiff does accurately note that the Medical Defendants generally acknowledged that (1) an EKG, alone, is not a method of diagnosing the risk of a potential stroke, (2) other types of tests, such as a cardiogram or MRI, could better diagnose such a risk, and (3) various types of medicine for treating high blood pressure could have been prescribed to Plaintiff.  However, such testimony only establishes, at most, that there is a disagreement about the course of treatment Plaintiff's

doctors chose—not that the Medical Defendants were aware of a serious medical necessity or suffering, and nevertheless did nothing, knowing that failure to intervene would continue and exacerbate that suffering, or result in permanent damage.  Furthermore, although Plaintiff testified that he spoke only "a little bit" of English and there were instances where he would have to use "English to the best of [his] ability and sometimes [medical staff] would understand," Dkt. No. 136-8 at 18, 39, Plaintiff does not establish how his inability to effectively communicate with medical staff actually affected the Medical Defendants' ability to treat him in this instance.  *Cf. Clarkson v. Coughlin*, 898 F. Supp. 1019, 1049 (S.D.N.Y. 1995) (holding that he failure to provide interpreters during medical treatment violated the Eighth Amendment where that communication was "essential to the efficacy of the treatment in question").

Moreover, the Medical Defendants explained that in-person interpretation was available when necessary.  *See* Dkt. No. 137-3 at 10-11.  For example, at the nurses' station within the medical unit, a list was maintained of facility employees and their language capabilities.  *See id.* at 11.  This list included medical staff, counselors, and security staff.  *See id.*  Defendant Gusman remembers treating Plaintiff and indicated that he conversed freely with him and other members of the staff in English and that he never requested the assistance of an interpreter.  *See id.*

Plaintiff argues that, under *Ruffin v. Deperio*, 97 F. Supp. 2d 346, 354 (W.D.N.Y. 2000), "evidence that a medical practitioner's conduct substantially departs from accepted professional judgment, practice, or standards is sufficient to meet the subjective prong," and asserts that here, there is a question of fact about whether the Medical Defendants substantially departed from accepted medical practice.  Dkt. No. 142 at 10.  *Ruffin*, however, is distinguishable from this case.  There, the plaintiff, a diabetic, was injured when a table was dropped on his foot.  Over the next several months, the plaintiff made "repeated complaints of pain, swelling, difficulty

in walking, [and] inability to sleep due to foot pain," and his condition worsened, presenting symptoms such as "blackening of his toes" and "glycerin levels which were regularly three to five times the normal level." *Ruffin*, 97 F. Supp. 2d at 354. The court held that "the defendants' failure to act on [the plaintiff's] repeated complaints" despite the "obvious symptoms of serious medical problems in a diabetic" constituted "deliberate indifference to [the plaintiff's] serious medical needs." *Id.* Unlike *Ruffin*, Plaintiff did not complain of or present worsening or "obvious" symptoms of an impending stroke to the Medical Defendants. Furthermore, unlike the plaintiff in *Ruffin*, who offered the report of an expert witness on his medical treatment, Plaintiff does not offer any such evidence to establish that his treatment substantially departed from accepted medical practice.

Additionally, the Court notes that, in the months leading up to Plaintiff's stroke on February 16, 2012, he was regularly seen by the medical staff at Eastern, but for treatment unrelated to his elevated blood pressure/heart palpitations. On February 16, 2012, Plaintiff was brought to the medical unit after he had been found sitting on the floor in the armory, responsive, but complaining of numbness. *See* Dkt. No. 137-3 at 7-8. Plaintiff had been lifting weights when he experienced a sudden onset of dizziness and weakness of his left side. *See id.* Defendant Gusman evaluated Plaintiff and immediately called for an ambulance to transport him to the Ellenville Emergency Room. *See id.* at 8.

The undisputed facts demonstrate that the Medical Defendants consistently and appropriately treated Plaintiff. When Plaintiff complained of elevated heart rate and heart palpitations in May of 2011, Defendant Andola ordered an EKG, bloodwork, and issued a blood pressure card so that his blood pressure would be more closely monitored. *See id.* at 4-5. In fact, Plaintiff received an EKG on four occasions at Eastern from 2008 to 2011. *See* Dkt. No. 142-1 at

4-5.  Each EKG showed that Plaintiff's heart was experiencing normal sinus rhythm.  *See id.*

While Plaintiff believes that additional treatment and testing were warranted based on his earlier

complaints, given the level of care provided, the undisputed facts demonstrate that Defendants

were not deliberately indifferent to Plaintiff's serious medical needs.  *See Gumbs v. Dynan*, No.

11-CV-857, 2012 WL 3705009, *14 (E.D.N.Y. Aug. 26, 2012) ("[A] medical judgment is not

deliberate indifference just because it is not the inmate's preferred course of treatment.  'Whether

to order an MRI or similar diagnostic treatments is a classic example of a matter for medical

judgment, and where the treatment provided is responsive to the prisoner's condition, . . . the fact

that a prisoner might prefer different treatment does not give rise to' a Constitutional violation")

(quoting *Victor v. Milicevic*, 361 Fed. Appx. 212, 215 (2d Cir. 2010)).

Accordingly, the Court grants Defendants' motion for summary judgment with respect to

Plaintiff's first cause of action.

## C.    Retaliatory Transfer

Defendants argue that (1) Plaintiff has failed to establish that Defendants took an adverse

action against him, (2) Plaintiff has failed to establish a causal connection between the protected

speech and the adverse action, and (3) even assuming Plaintiff had established a *prima facie* case,

Defendants are entitled to judgment as a matter of law because they have satisfied the burden of

establishing that the alleged adverse action would have been taken in the absence of any improper

motive.  *See* Dkt. No. 136-1 at 10-13; Dkt. No. 143 at 7-8.  In opposition, Plaintiff argues that a

transfer to a distant prison where family and counsel can not visit regularly may constitute an

adverse action for First Amendment retaliation purposes and is sufficient evidence of adversity to

survive summary judgment.  *See* Dkt. No. 142 at 20.  Plaintiff also argues that his testimony that

his transfer was initiated because officials at the prison facility learned of his protected activity is

sufficient circumstantial evidence to create a triable issue of fact as to whether (1) there was a causal connection between his protected speech and the transfer, and (2) the transfer would have occurred absent an improper motive. *See id.* at 21-24. The Court finds that the undisputed facts do not support Plaintiff's retaliation claim.

"Courts properly approach prisoner retaliation claims 'with skepticism and particular care,' because 'virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.'" *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quotation and other citation omitted). "To prove a First Amendment retaliation claim under Section 1983, a prisoner must show . . . '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)).

Defendants concede, for the purposes of this motion, that Plaintiff's grievances and his commencement of this lawsuit constitute protected speech or conduct. Furthermore, it is clear that a transfer to another facility under the circumstances here may constitute an adverse action. *See Smith v. Levine*, 510 Fed. Appx. 17, 21 (2d Cir. 2013) (citing *Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir. 1998)); *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001).

As to the third element—whether a causal connection exists between the plaintiff's protected activity and a prison official's actions—factors to be considered include: "(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation." *Cole v. New York State Department of*

15

*Correctional Services*, No. 9:10-CV-1098, 2012 WL 4491825, *11 (N.D.N.Y. Aug. 31, 2012)

(citing *Colon v Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).  Upon satisfying his initial burden,

"the burden shifts to [the] defendants to establish that the same adverse action would have been

taken even in the absence of the plaintiff's protected conduct, *i.e.*, 'even if they had not been

improperly motivated.'" *Davidson v. Desai*, 817 F. Supp. 2d 166, 194 (W.D.N.Y. 2011) (quoting

*Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996)).  "At the summary judgment stage, if the

undisputed facts demonstrate that the challenged action clearly would have been taken on a valid

basis alone, defendants should prevail." *Davidson v. Chestnut*, 193 F.3d 144, 149 (2d Cir. 1999);

*see also Murray v. Hulihan*, 436 Fed. Appx. 22, 23 (2d Cir. 2011) ("Defendants cannot be liable

for First Amendment retaliation if they would have taken the adverse action even in the absence

of the protected conduct").

Plaintiff has failed to put forth sufficient facts to support an inference that the protected

conduct played a substantial part in the adverse action.  Although Plaintiff's transfer was close in

time to his protected activities, and Plaintiff had an exemplary disciplinary record, both

Defendant Demshick and Defendant McGlynn testified that they were wholly unaware of

Plaintiff's grievances and pending lawsuit when they processed Plaintiff's transfer.  *See* Dkt. No.

136-3 at 4, Dkt. No. 136-5 at 2.  Plaintiff argues that there is sufficient circumstantial evidence to

create to a triable issue of fact as to whether officials at the prison facility had learned of his

protected activities.  Plaintiff relies on his testimony that, shortly before he was transferred to

Franklin, he was approached by a prison guard who stated: "[O]h, you're the one that wants

money from the state." Dkt. No. 136-8 at 73; *see* Dkt. No. 142 at 23.  However, even after

according Plaintiff deference as the non-moving party, it is not reasonable to infer, based on a

single comment made by a corrections officer, that the entire staff of Shawangunk and DOCCS

Central Office in Albany were aware of Plaintiff's protected actions—especially in light of the skepticism with which prisoner retaliation claims must be approached.

Even assuming that Plaintiff had raised a triable issue of fact as to the third element of the retaliation claim, Plaintiff's claim would still fail because the undisputed facts demonstrate that Plaintiff would have been transferred even in the absence of his protected conduct.  The transfer process began with an automated security classification review conducted by a computer system that recommended Plaintiff's security classification be reduced from maximum to medium.  Defendant Demshick then submitted the transfer request because it was DOCCS policy to house prisoners in the least restrictive appropriate facility, and Shawangunk was a maximum-security facility.  Defendant McGlynn, in turn, chose Franklin—one of three available medium-security facilities that could meet Plaintiff's medical needs—because it appeared, to her, that it was the closest facility to Plaintiff's desired region.  Plaintiff's assertion that Defendant Demshick actually chose Franklin to hinder his counsel's access is entirely speculative, and there is no evidence in the record that Plaintiff's prior grievances or pending lawsuit precipitated or influenced this process at any point.

Accordingly, the Court grants Defendants' motion for summary judgment with respect to Plaintiff's second cause of action.

**D.      Denial of Access**

Defendants argue that Plaintiff cannot make a showing that the enforcement of DOCCS Directive 4423 restricted his access to the courts or caused him to suffer any actual injury.[4]

---

[4] Defendants also argue that Plaintiff must establish that they acted "maliciously" when they enforced DOCCS Directive 4423.  *See* Dkt. No. 136-1 at 13; Dkt. No. 143 at 9.  Defendants rely on *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003), which only mentions maliciousness in the parenthetical of a cite to the district court case *Cancel v. Goord*, No. 00 Civ.2042, 2001 WL 303713 at *4 (S.D.N.Y. Mar. 29, 2001); *see also DeMeo v Tucker*, 509 Fed. Appx. 16, 18 [2d Cir

Plaintiff contends that material factual disputes remain over whether Defendants' actions frustrated his right to access the courts, and that Defendants' actions "clearly frustrated this litigation, which could not progress efficiently and was delayed to the point that [Plaintiff] served his whole sentence and was deported—an event that led to the administrative closure of this case, another appeal, and more delay." Dkt. No. 142 at 27. As Defendants argue, Plaintiff has not made a showing that the enforcement of DOCCS Directive 4423 caused him to suffer any cognizable injury on this record.

To state a claim for denial of access to the courts, a plaintiff must prove that the defendant "took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.'" *Davis*, 320 F.3d at 351 (citing *Monsky v. Moraghan*, 127 F.3d 243, 247 (2d Cir. 1997)); *see also Lewis v. Casey*, 518 U.S. 343, 351 (1996). A prison's restrictions on an inmate's telephone use may violate the inmate's First Amendment right to access the courts. *See Kwok Sze v. Annucci*, No. 13-CV-534, 2017 WL 913646, *2 (N.D.N.Y. Mar. 7, 2017). However, a plaintiff must "must demonstrate that a defendant caused 'actual injury.'" *Monsky*, 127 F.3d at 247.

Plaintiff cannot, based on this record, make a showing that the enforcement of DOCCS Directive 4423 caused him to suffer any cognizable injury. As Defendants note, Plaintiff has not missed a filing deadline nor has he had his case dismissed for failing to prosecute this action or

2013] (mentioning "deliberate and malicious conduct" in a denial of access claim and citing to *Davis*). *Cancel* makes repeated reference to "deliberate and malicious interference" in its general statement of the legal standard, *see Cancel*, 2001 WL 303713 at *4-5, but relies on *Washington v. James*, 782 F.2d 1134, 1138 (2d Cir. 1986), and *Lewis v. Casey*, 518 U.S. 343, 349 (1996)—neither of which appear to contain a "malicious" interference requirement. However, given the alternative ground for the dismissal of this cause of action detailed below, the Court finds it unnecessary to address this argument.

comply with a court order.[5]  Rather, Plaintiff argues that DOCCS Directive 4423's

one-call-per-month policy caused unnecessary delay and "clearly frustrated this litigation, which

could not progress efficiently." Dkt. No. 142 at 27.  Delay and inefficiency, however, are not

cognizable injuries for this claim.  *See Lewis*, 518 U.S. at 356 (describing the dismissal of a case

with prejudice and being prevented from filing legal actions as "two instances of actual injury").

Contrary to Plaintiff's argument otherwise, *Simkins v. Bruce*, 406 F.3d 1239 (10th Cir.

2005), does not stand for the proposition that inefficiency and delay can be a cognizable injury.

In *Simkins*, the plaintiff's failure to receive a motion for summary judgment and order in a prior

action "resulted in (1) admission of the defendants' version of the facts, (2) inability to argue the

legal issues, and (3) loss of an opportunity to appeal," which "present[ed] a compelling example

of an impediment or hindrance demonstrating actual injury under *Lewis*." *Simkins*, 406 F.3d at

1243.  The crux of the decision in *Simkins* was that the plaintiff was not required to "prove a case

within a case" by showing that he would have filed a meritorious response if he had received a

copy of the motion for summary judgment and that "cognizable harm arises not only when a

claim is lost or rejected on account of the defendant's misconduct, but also when the plaintiff's

efforts to pursue a claim are impeded." *Id.* at 1244 (citing *Lewis*, 518 U.S. at 351, 353 & n.4).

Here, Plaintiff has not suffered any of the impediments described by the court in *Simkins* as a

result of Directive 4423's restrictions on his legal calls.

Moreover, courts have consistently found that "a prisoner's access to counsel via

telephone may be restricted so long as the prisoner has some other avenue to communicate, even

---

[5]  The Court notes that the prior administrative closure of this case after Plaintiff's
deportation was not the equivalent of a dismissal.  *See Mire v. Full Spectrum Lending Inc.*, 389
F.3d 163, 167 (5th Cir. 2004) (holding that an administrative closure "is the functional equivalent
of a stay, not a dismissal").

if less than ideal." *Ahlers v. Townsend*, No. 12-CV-0575, 2014 WL 4365277, *5 (N.D.N.Y. Aug.

28, 2014). Plaintiff contends that he did not have alternative means of communicating with his

attorneys because of his physical limitations after his stroke and because he is unable to read or

write in English. *See* Dkt. No. 142-1 at 26-27. Plaintiff, however, acknowledges that he can read

and write in Spanish. *See* Dkt. No. 136-8 at 17-18. Moreover, Plaintiff's counsel, Karen King,

stated that whenever she spoke with Plaintiff, a Spanish speaking attorney on her team was

present to provide interpretation. *See* Dkt. No. 142-9 at 2. That same Spanish-speaking attorney

visited Plaintiff on multiple occasions before his transfer to Franklin. *See id.* While Plaintiff may

have been limited in his ability to communicate with counsel by telephone, nothing prevented

Plaintiff from corresponding with counsel through the mail, especially considering members of

Plaintiff's legal team spoke Spanish. As such, the Court finds that Plaintiff had alternative means

of communicating with counsel.

Accordingly, the Court grants Defendants' motion for summary judgment with respect to

Plaintiff's third cause of action.

### E.    Qualified Immunity

Defendants argue that, even assuming that a question of fact precludes summary judgment

on Plaintiff's claims, the motion should nevertheless be granted because they are entitled to

qualified immunity as a matter of law. In opposition, Plaintiff argues that each of the violations

he alleged involved rights that were clearly established under existing law at the time of the

challenged conduct, and it was not objectively reasonable for Defendants to believe their conduct

was lawful.

"Officials are sheltered from suit, under a doctrine known as qualified immunity, when

their conduct 'does not violate clearly established . . . constitutional rights' a reasonable official,

similarly situated, would have comprehended." *Wood v. Moss*, 572 U.S. 744, 748 (2014) (quoting

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "The issues on qualified immunity are: (1)

whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether

that right was clearly established; and (3) even if the right was clearly established, whether it was

objectively reasonable for the [official] to believe the conduct at issue was lawful." *Phillips v.*

*Wright*, 553 Fed. Appx. 16, 17 (2d Cir. 2014); *see also Terebesi v. Torreso*, 764 F.3d 217, 230

(2d Cir. 2014).  Here, as set forth above, Plaintiff has failed to raise a material issue of fact with

respect to whether Defendants violated a constitutional right and, therefore, Defendants are

shielded from suit under this doctrine.  However, even assuming the Court needed to reach the

remaining factors in the qualified immunity test, Defendants are still entitled to qualified

immunity.

　　　　With respect to the Medical Defendants, although Plaintiff accurately notes that a

prisoner's right to be free from deliberate indifference to his serious medical needs has been

clearly established, Plaintiff fails to identify any authority that would have put the Medical

Defendants on clear notice that their failure to take specific actions to prevent a stroke under these

facts constituted deliberate indifference.  Plaintiff cites only to *Tate v. Coffee County*, Tenn., 48

Fed. Appx. 176 (6th Cir. 2002).  In *Tate*, an inmate complained via a written note of numbness

and tingling, an inability to get out of bed, paralysis, and no feeling in one of his hands.  Upon

receiving the note, the defendant nurse suspected that the inmate might have had a stroke, but

failed to examine him or conduct any diagnostic tests.  The Sixth Circuit held that "a reasonable

prison nurse would have been aware that a failure to examine a patient complaining of stroke

symptoms was in derogation of the inmate's constitutional rights." *Tate*, 48 Fed. Appx. at 180.

Here, however, Plaintiff presented different symptoms—chiefly, elevated blood pressure and a

complaint of a periodically racing heart beat with occasional heart palpitations—and at no point did the Medical Defendants suspect that Plaintiff was presenting the symptoms of an impending stroke.

Similarly, although restrictions on an inmate's telephone use may, in certain circumstances, violate the inmates' First Amendment right to access the courts, it appears to have been reasonable here for Defendants Jacobs, McKoy, and Traynor to believe that enforcing Directive 4423 was lawful.  "When officials follow an established prison policy . . . their entitlement to qualified immunity depends on whether a reasonable officer might have believed that the challenged order was lawful in light of legitimate penological interests supporting the directive."  *Barnes v. Furman*, 629 Fed. Appx. 52, 57 (2d Cir. 2015) (quotation marks omitted). The reasonableness of an action depends on "facts and circumstances of each particular case." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).  Here, the purpose of Directive 4423's limitation on the time and number of legal calls was "to ensure that all inmates had equal access to their attorneys" in light of increasing prison populations—clearly a legitimate penological interest.  Dkt. No. 136-6 at 3.  Furthermore, Directive 4423 allowed for inmate's attorneys to contact DOCCS Counsel's Office or obtain a court order to circumvent this policy.  Thus, even assuming that the Court had found Directive 4423 to violate Plaintiff's constitutional rights, it was objectively reasonable for Defendants Jacobs, McKoy, and Traynor to believe that enforcing Directive 4423 did not unconstitutionally restrict Plaintiff's access to the courts.

Finally, it is well established that prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights.  However, Defendants Demshick and McGlynn would also be entitled to qualified immunity.  Even assuming that these defendants were aware of Plaintiff's lawsuit and grievances, the transfer here was started via an automated

review of Plaintiff's security clearance and Defendants Demshick and McGlynn were thereafter required, under DOCCS policy, to transfer Plaintiff to a correctional facility with an appropriate security level. *Cf. Siggers-El v. Barlow*, 412 F.3d 693, 701 (6th Cir. 2005) (finding that the defendant *initiated* a transfer in retaliation for the inmate plaintiff's constitutionally protected action); *Williams v. Brown*, 347 Fed. Appx. 429, 435 (11th Cir. 2009) (same).[6]

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 136) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance in the Local Rules.

**IT IS SO ORDERED.**

Dated:  October 12, 2021
      Albany, New York

**Mae A. D'Agostino**
**U.S. District Judge**

---

[6] Moreover, the Court notes that Defendants Demshick and McGlynn were not named defendants in this matter at the time of Plaintiff's transfer to Franklin.  Rather, they were added as Defendants in this action only after the transfer had occurred.